## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND SEARCH WARRANTS

I, Daniel Cronin, being duly sworn, depose and state as follows:

### Agent Background

1.      I am a "federal law enforcement officer" as defined in Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a government agent who is engaged in enforcing the criminal laws of the United States and within a category of officers authorized by the Attorney General to request a search warrant.

2.      I have been employed as a police officer by the Town of North Andover, Massachusetts, for approximately 34 years. For approximately 29 years, I have been a Detective in the Criminal Investigation Division. For approximately nine years, I have been a Task Force Officer ("TFO") assigned to the Federal Bureau of Investigation ("FBI") Lowell Resident Agency.

3.      I have participated in over 190 narcotic investigations and have been involved in the arrest and prosecution of over 120 persons for various narcotic offenses.  I have also received advanced specialized training in the following areas: Drug Enforcement Administration Narcotics Investigations, specialized training in the application and execution of search warrants at the Massachusetts State Police Academy, and crime-scene investigation and preservation. Additionally, I have received specialized training related to criminal activity over the Internet, sponsored by the Northeastern Massachusetts Law Enforcement Council (N.E.M.L.E.C.) Computer Crime Unit and Chelmsford, Massachusetts Police Department.  I have testified in the criminal courts of the Commonwealth of Massachusetts more than 300 times.

4.      As an FBI TFO, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code.  I have received specialized training through the FBI regarding the activities of narcotics traffickers,

including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics trafficking activities.

5.      I am familiar with the manner and means commonly employed by drug traffickers, including those employed to avoid detection by law enforcement.  I am also familiar with the terminology and slang commonly employed by drug traffickers.  In my training and experience, I have observed and examined cocaine, cocaine base ("crack"), heroin, fentanyl, methamphetamine, oxycodone, and other controlled substances.  I am aware of the prices commonly charged on the street for these substances, the method of packaging, and the street terms used in their trade.

6.      I have participated in various aspects of drug-related investigations. I have participated in controlled purchases of narcotics utilizing confidential sources and undercover law enforcement agents and officers.  I have prepared affidavits submitted in Massachusetts courts – both state and federal – in support of applications for criminal complaints, search warrants, tracking warrants, and arrest warrants.  I have also conducted and coordinated electronic and physical surveillance of individuals involved in the illegal distribution of controlled substances.

7.      Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information), and use encrypted messaging applications to thwart law enforcement's use of electronic surveillance.  I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

## Purposes of the Affidavit

8.    I submit this affidavit in support of an application for a criminal complaint charging Juana Liduvina AGUASVIVAS, a/k/a Yoselin Aguasvivas Lucero, a/k/a Juana Ybelissis Aguasvivas, a/k/a "Duva," Richard ARIAS-AGUAVIVAS, a/k/a "Manny", and Ariel RUIZ, a/k/a "Elvin" (the "Target Subjects") with conspiracy to distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846 (the "Charged Offense"). Based on the facts set forth in this affidavit, there is probable cause to believe that AGUASVIVAS, ARIAS-AGUASVIVAS, and RUIZ have committed the Charged Offense.

9.    In addition to the Charged Offense, I have been investigating AGUASVIVAS, ARIAS-AGUASVIVAS, and RUIZ for distribution of and possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841. This crime and the Charged Offense constitute the "Target Offenses."

10.    I also submit this affidavit in support of an application for a search warrant for the following premises and the cellular phones located therein for fruits and instrumentalities of the Target Offenses, described more fully in Attachment B:

a.    <u>Target Location 1</u>: 82 Haverhill Street, Apartment 3, Lawrence, Massachusetts 01841, including all cellular telephones located therein belonging to and/or used by the Target Subjects. Target Location 1 is further described in Attachment A-1.

b.    <u>Target Location 2</u>: 86 Haverhill Street, First Floor, Right Rear Apartment, Lawrence, Massachusetts 01841, including all cellular telephones located therein belonging to and/or used by the Target Subjects. Target Location 2 is further described in Attachment A-2.

c.    <u>Target Location 3</u>: The basement apartment on the left side of 80-86 Haverhill Street, Lawrence Massachusetts 01841, including all cellular telephones located therein belonging to and or used by the Target Subjects. Target Location 3 is further described in Attachment A-3.

11.     As a result of my personal participation in the investigation, review of reports submitted by other law enforcement personnel, and my consultations with other officers, I am familiar with this investigation.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  I submit this affidavit for the limited purpose of establishing probable cause for the requested criminal complaint and warrants.  Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation. All times are approximate.

### Description of the Target Locations

12.     Target Locations 1, 2, and 3 are all located in one three-story, multi-unit building containing the addresses of 80, 82, 84, 86 Haverhill Street, Lawrence, Massachusetts (the "Haverhill Street Building"). The Haverhill Street Building has four doors in the front, two doors on the left side, two doors on the right side, and two doors in the rear.

13.     Utility records show that there are eight apartments inside the Haverhill Street Building, but the apartments are not named in a uniform way. The records list the following apartments: 80 Haverhill St HSE; 80 Haverhill St Fl 1; 82 Haverhill St Fl 2; 82 Haverhill St Fl 3; 84 Haverhill St Fl 2; 84 Haverhill S Fl3; 86 Haverhill St HSE; and 86 Haverhill St Apt 1. In my experience, the lack of uniformity in the addresses in utility records is not uncommon for multi-unit apartment buildings in Lawrence. Based on my training and experience, and information obtained from confidential sources and surveillance, I believe there are two legal apartments at 80 Haverhill Street, two legal apartments at 82 Haverhill Street, one of which is Target Location 1, two legal apartments at 84 Haverhill Street, and two legal apartments at 86 Haverhill Street, one of which is Target Location 2.

4

14.     Based on information from two confidential sources, including the one referenced in paragraphs 38 and 39 below who entered Target Location 3 on June 8, 2023, and their recording, investigators believe that there is an illegal basement apartment that is located in the back of the left side of the building that does not have its own address (Target Location 3).

15.     I believe that Target Location 1 is on the third floor of 82 Haverhill Street, inside the Haverhill Street Building, and is RUIZ's primary residence. This belief is consistent with the utility records listing two legal apartments in 82 Haverhill Street, one of the second floor, and one on the third, and Registry of Motor Vehicle ("RMV") records showing that 1) RUIZ has two cars registered at "82 Haverhill Street APT 3 Lawrence MA" and 2) that the address associated with his driver's license is "82 Haverhill Street Lawrence MA." I believe that 82 Haverhill Street is in the left side of the Haverhill Street Building and accessed through an outer door on the left side of the building, which leads to a stairwell, which in turn leads to second and third floor apartments, each of which is accessed through an interior door, with Target Location 1 being on the third floor.

16.     Based on physical surveillance, pole camera footage, and recordings from controlled buys, I believe that Target Location 2 is located in 86 Haverhill Street, on the first floor of the right side of the Haverhill Street Building, and is accessed from a side door of the building. Confidential sources have stated, and investigators have seen from the recordings, that when a person enters that specific outer door to 86 Haverhill Street, they are inside Target Location 2.

17.      For the same reasons, I believe that Target Location 3 is on the left side of the building and is accessed through a door at the rear of the left side of the building. There is only one door on the rear left side of the building. Confidential sources have stated, and investigators have seen from the recordings, that when a person enters that specific door, they are inside Target Location 3.

## **Probable Cause**

### *Investigation Background*

18.    In April 2021, investigators learned from a source of information that AGUASVIVAS and members of her extended family, including RUIZ, distributed kilogram quantities of cocaine, fentanyl, and cutting agents and adulterants ("cut"), to drug dealers in the Lawrence, Massachusetts, area. The source reported that AGUASVIVAS lived in Target Location 2. This was confirmed with other confidential sources and through observations made of AGUASVIVAS during physical surveillance of Target Location 2, described below. Investigators also learned, from toll records from 2021 that the target of another narcotics investigation was in contact with several phone numbers that investigators identified as belonging to AGUASVIVAS and her family members.

### *April 21, 2021: AGUASVIVAS and RUIZ distributed approximately 50 grams of fentanyl from inside Target Location 2.*

19.    On April 19, 2021, at the direction of and under the supervision of investigators, a confidential informant (the "CI")[1] placed a recorded call to AGUASVIVAS, who agreed to meet the CI on April 21, 2021. The CI identified the number as belonging to AGUASVIVAS. This call has been preserved. The call was in Spanish and reviewed by a Spanish-speaking investigator.

20.    On April 21, 2021, investigators met with the CI at a predetermined location, where they searched the CI and the CI's vehicle for contraband and currency with negative results. The

_____

[1] The CI began cooperating because s/he hoped to receive immigration assistance. The CI's criminal history includes assault with a dangerous weapon, fraud, true name violation, and falsely obtaining credit. The information provided by the CI has been corroborated to the extent possible and is believed to be reliable. The CI received compensation for their assistance but did not receive assistance with their immigration status.

CI told investigators that it was common practice for customers to walk up to Target Location 2 and purchase fentanyl and/or cut. Other FBI sources have corroborated this information. Investigators instructed the CI to travel to Target Location 2 to attempt to purchase fentanyl and equipped the CI with an audio/video recording and transmitting device. Investigators surveilled the CI drive from the predetermined location to Target Location 2 and saw the CI enter Target Location 2.

21.    When the CI entered Target Location 2 on April 21, 2021, s/he encountered AGUASVIVAS and ARIAS-AGUASVIVAS in the living room. RUIZ then entered the living room, and AGUASVIVAS instructed him, in Spanish, to get an "unused one" and package it in a small bag.  The CI informed investigators that an "unused one" meant 50 grams of fentanyl from a whole kilogram of fentanyl. RUIZ complied, handed the bag to AGUASVIVAS, and AGUASVIVAS handed the bag to the CI. AGUASVIVAS did not require payment from the CI at the time. The transaction was recorded and conducted in Spanish. A Spanish-speaking investigator has reviewed the recording, which has been preserved.

22.    The CI then left Target Location 2, and investigators surveilled him/her as s/he drove from Target Location 2 to a predetermined location, where s/he met with investigators, who collected a plastic bag with clear plastic bag containing a white powdered substance from him/ her. Investigators sent the substance to a Drug Enforcement Administration ("DEA") laboratory, which confirmed that the substance weighed 49.87 grams and contained fentanyl.



***April 30, 2021: AGUASVIVAS and RUIZ distributed approximately 50 grams of fentanyl inside Target Location 2.***

23.    On April 30, 2021, at the direction of and under the supervision of investigators,

the CI placed a recorded call to AGUASVIVAS to arrange a second transaction for April 30, 2021. This call has been preserved. That morning, investigators met with the CI and a confidential source ("CS-1")[2] at a predetermined meet location, where they searched the CI and CS-1 and their vehicle for contraband and currency with negative results. Investigators equipped CS-1 with an audio/video recording and transmitting device and provided CS-1 with official funds to purchase narcotics from AGUASVIVAS.

24.     While investigators were meeting with the CI and CS-1, other investigators placed surveillance around Target Location 2. Investigators then observed the CI and CS-1 enter Target Location 2. The entire meeting that occurred in Target Location 2 was recorded. The recording was preserved, and a Spanish-speaking investigator has reviewed it.

25.     Upon entering Target Location 2, the CI and CS-1 encountered two of AGUASVIVAS's family members and asked for AGUASVIVAS. When AGUASVIVAS appeared, the CI told AGUASVIVAS that s/he had the money for what the CI got last time, referring 50 grams of fentanyl (described above), and what CS-1 was getting today. AGUASVIVAS asked the CI, in Spanish, "what is she getting today?" The CI told AGUASVIVAS, in Spanish, "same thing as last time." The CI then provided AGUASVIVAS with $5,500 in official funds to pay for the previous purchase and that day's purchase. AGUASVIVAS

---

[2] CS-1 originally began cooperating with investigators after being arrested for controlled substance offenses. The charges were eventually dismissed based on CS-1's cooperation. CS-1 now receives financial compensation for CS-1's assistance. CS-1's criminal history includes arrests and convictions for controlled substances offense, breaking and entering, possession of burglarious tools among other crimes.  Information provided by CS-1 has led to the identification of narcotics traffickers and the seizure of narcotics.  The information provided by CS-1 has been corroborated to the extent possible and is believed to be reliable. CS-1 is willing to testify.

then directed RUIZ, in Spanish, to get the same as last time. While CS-1 went into the bathroom, AGUASVIVAS advised to the CI to be careful that CS-1 was not a cop. AGUASVIVAS then gave the CI $100 for bringing her a new client.

26.    RUIZ returned to the room with the fentanyl and handed it to AGUASVIVAS. AGUASVIVAS then placed the fentanyl in a bag and handed it to CS-1. CS-1 and the CI then left Target Location 2, and investigators observed them leave Target Location 2.

27.    Investigators then surveilled CS-1 and the CI as they  traveled to predetermined meet location in their vehicle. Upon their arrival, investigators searched CS-1, the CI, and their vehicle, with negative results. Investigators then collected the substance from CS-1 and the CI and sent it to a DEA laboratory for testing. The laboratory confirmed that the substance weighed 49.893 grams and contained fentanyl.

***May 13, 2021: CS-1 bought approximately 35 grams of fentanyl from AGUASVIVAS and RUIZ inside Target Location 2; ARIAS-AGUASVIVAS assisted in the negotiation.***

28.    On May 13, 2021, investigators met with CS-1 at a predetermined meet location where they searched CS-1 and CS-1's vehicle with negative results. Investigators equipped CS-1 with video/audio recording and transmitting devices and provided CS-1 with $1,950 in official funds to purchase narcotics. At the direction of the investigators, CS-1 traveled to Target Location 2 to purchase fentanyl from AGUASVIVAS.  Investigators followed CS-1 from the meet location to the area of Target Location 2, where CS-1 exited his/her vehicle and knocked on the door of Target Location 2.

29.    CS-1's interactions with the occupants of Target Location 2 were recorded. The recordings have been preserved, were partially in Spanish, and have been reviewed by investigators who are fluent in both languages.

9

30.     CS-1 was greeted at the door by AGUASVIVAS. RUIZ then arrived and greeted CS-1. CS-1 asked RUIZ if he spoke English, who responded that he did not. Shortly thereafter ARIAS-AGUASVIVAS arrived, and AGUASVIVAS introduced ARIAS-AGUASVIVAS as her baby. CS-1 identified themselves, and ARIAS-AGUASVIVAS identified himself as Manny. AGUASVIVAS then told ARIAS-AGUASVIVAS that CS-1 was friends with the CI. ARIAS-AGUASVIVAS asked CS-1 why s/he was there. CS-1 explained that s/he wanted $1,950 worth of the same thing as last time (fentanyl).

31.     ARIAS-AGUASVIVAS began to negotiate the price of the fentanyl per gram. At this point, a man[3] arrived. The man and ARIAS-AGUASVIVAS discussed the price per gram. ARIAS-AGUASVIVAS agreed to sell the product at $55 per gram. AGUASVIVAS then told ARIAS-AGUASVIVAS that she believed that CS-1 also needed cut, which is the term that drug dealers use to describe cutting agents and adulterants that are used to prepare narcotics for sale. CS-1 agreed that s/he needed cut, and all discussed the type of cut that CS-1 needed. The man and AGUASVIVAS discussed the cut CS-1 was using, and the man advised the CS-1 not to use that anymore. AGUASVIVAS asked CS-1 what color cut CS-1 wanted. The man and ARIAS-AGUASVIVAS also asked CS-1 what color cut CS-1 wanted for the fentanyl.

32.     AGUASVIVAS then left the room to retrieve different samples of cut to show CS-1.  ARIAS-AGUASVIVAS then began to renegotiate the price per gram and showed the CS-1 his cell phone while using the calculator application. ARIAS-AGUASVIVAS then asked RUIZ and AGUASVIVAS, in Spanish, whether to give fentanyl that had already been cut to CS-1 for $55

---

[3] I know the name of this man but am not disclosing it at this time because it is not relevant to the determination of probable cause.

per gram. As CS-1 took the money out, AGUASVIVAS instructed RUIZ to count the money. ARIAS-AGUASVIVAS and the man then showed CS-1 different samples of cut. AGUASVIVAS then instructed ARIAS-AGUASVIVAS not to charge CS-1 for the cut. AGUASVIVAS handed CS-1 fentanyl in a black bag, and CS-1 left Target Location 2.

33.    Investigators then surveilled CS-1 as they traveled to the predetermined meet location in their vehicle. Upon their arrival, investigators searched CS-1 and their vehicle, with negative results. Investigators then collected the substance from CS-1 and sent it to the DEA laboratory, where analysts confirmed that the substance weighed 34.881 grams and contained fentanyl.



***November 2021 – August 2022: Investigators conducted controlled purchases of cocaine base and fentanyl from the Target Subjects either inside or near Target Locations 1 and 2 or after a Target Subject exited the outer door to Target Location 1.***

34.    On November 18, 2021, investigators met with a second confidential source ("CS-2")[4], who informed investigators that s/he met ARIAS-AGUASVIVAS a few years earlier through a friend. That friend had given CS-2 ARIAS-AGUASVIVAS's phone number, and CS-2 would contact ARIAS-AGUASVIVAS using that number to buy cocaine base. CS-2 reported that

_____

[4] CS-2 originally began cooperating with investigators after being charged with controlled substances offenses. CS-2 was originally cooperating in hopes of receiving dismissals of the drug charges. The charges were eventually dismissed based on CS-2's cooperation. CS-2 currently receives compensation for his/her assistance. CS-2's criminal history includes arrests and/or convictions for the operating after a suspended license, breaking and entering, assault and battery, drug offenses and theft. Information provided by the CS-2 has been corroborated to the extent possible and is believed to be reliable. CS-2 is willing to testify.

ARIAS-AGUASVIVAS would dispatch a courier to Mechanic Street in Lawrence, which is close to the Haverhill Street Building, or the alley behind the Haverhill Street Building.

35.    In 2021 and 2022, investigators conducted more than a dozen controlled purchases of illegal narcotics from AGUASVIVAS, ARIAS-AGUASVIVAS, and RUIZ. On the dates listed in the chart below, at the direction and supervision of controlling investigators, confidential sources (after being searched by investigators for contraband and money with negative results) or an undercover officer (the "UC") bought fentanyl and cocaine base from ARIAS-AGUASVIVAS, RUIZ, AGUASVIVAS, and couriers, in exchange for official funds. All of the controlled purchases were recorded, preserved, and reviewed by Spanish-speaking investigators. For each buy, investigators surveilled the confidential sources as they travelled to and from meet locations and searched them for contraband after each controlled purchase, with negative results.

36.    Investigators observed that couriers sometimes exited from the outer door to 82 Haverhill Street, the address in which Target Location 1 is located, to walk to the meet location and/or returned to that same door immediately after finishing the transaction. Specifically, on November 19, 2021, and December 16, 2021, the courier exited from the outer door to 82 Haverhill Street, the address in which Target Location 1 is located, before walking to the meet location (Mechanic Street). On November 22, 2021, and December 3, 2021, the courier exited from the outer door to 82 Haverhill Street, the address in which Target Location 1 is located, went to the meet location (Mechanic Street), and then entered the outer door to 82 Haverhill Street, the address in which Target Location 1 is located. On March 17, 2022, and April 1, 2022, the courier exited from the outer door to 82 Haverhill Street, the address in which Target Location 1 is located, and proceeded directly to the meet location (the alley behind the Haverhill Street Building).

37.    All drug types and quantities listed in this table are the result of forensic testing at the DEA laboratory.

| Date | Buyer | Distributor | Drug/Quantity | Location |
|------|-------|-------------|---------------|----------|
| 11.19.21 | CS-2 | ARIAS-AGUASVIVAS and a courier | 1.562 grams cocaine base | Mechanic Street |
| 11.22.21 | CS-2 | ARIAS-AGUASVIVAS and a courier | 3.149 grams cocaine base | Mechanic Street |
| 12.3.21 | CS-2 | ARIAS-AGUASVIVAS and a courier | 3.697 grams cocaine base | Mechanic Street |
| 12.16.21 | CS-2 | ARIAS-AGUASVIVAS and a courier | 3.726 grams cocaine base | Mechanic Street |
| 1.26.22 | CS-2 | ARIAS-AGUASVIVAS and a courier | 6.941 grams cocaine base | Mechanic Street |
| 2.11.22 | CS-2 | ARIAS-AGUASVIVAS and a courier | 8.612 grams cocaine base | Alley behind the Haverhill Street Building |
| 2.23.22 | UC | ARIAS-AGUASVIVAS and a courier | 15.976 grams cocaine base | Mechanic Street |
| 3.17.22 | CS-2 | ARIAS-AGUASVIVAS and a courier | 1.678 grams fentanyl 14.255 grams cocaine base | Alley behind the Haverhill Street Building |
| 4.1.22 | UC | ARIAS-AGUASVIVAS and a courier | 10.845 grams fentanyl 10.742 grams cocaine base | Alley behind the Haverhill Street Building |
| 5.2.22 | UC | ARIAS-AGUASVIVAS and a courier | 51.44 grams fentanyl 4.571 grams cocaine base | Alley behind the Haverhill Street Building |
| 6.3.22 | CS-2 | ARIAS-AGUASVIVAS and a courier | 2.906 grams cocaine base | Mechanic Street |
| 6.17.22 | UC | ARIAS-AGUASVIVAS and a courier | 51 grams fentanyl 2.985 grams cocaine base | Alley behind the Haverhill Street Building |
| 8.1.22 | UC | ARIAS-AGUASVIVAS and a courier | 159.9 grams fentanyl 2.83 grams cocaine base | Alley behind the Haverhill Street Building |
| 8.26.22 | UC | ARIAS-AGUASVIVAS and a courier | 209.8 grams fentanyl | Alley behind the Haverhill Street Building |

***June 8, 2023: CS-3 obtained cut and fentanyl while inside Target Location 3.***

38.     On June 8, 2023, investigators directed a third confidential source ("CS-3")[5] to go to Target Location 2 to make a purchase. On that day, AGUASVIVAS greeted CS-3 and asked CS-3 to come with her. AGUASVIVAS escorted CS-3 to Target Location 3. While in Target Location 3, CS-3 asked AGUASVIVAS for cut and if she had fentanyl. AGUASVIVAS then asked someone who she described as her grandson to get a fentanyl sample. AGUASVIVAS told CS-3 that if CS-3 did not like the quality of the fentanyl, CS-3 could bring it back because it was all in the family. RUIZ was in Target Location 3 during this meeting. The grandson left Target Location 3 and then returned with the sample of fentanyl, which he handed to CS-3.



[AGUASVIVAS and RUIZ in Target Location 3 on June 8, 2023]

39.     Based on the recording obtained by CS-3 that day, and as described more fully below, investigators believe that AGUASVIVAS makes her cut, and RUIZ stores narcotics, in Target Location 3.

---

[5] CS-3 cooperated in exchange for third party consideration on a federal charge assigned to another confidential source, who is defined below as CS-4.  CS-3 has no criminal history. Information provided by the CS-3 has been corroborated believed to be reliable. CS-3 is willing to testify.

14

***November 20, 2024:CS-4 bought cut from AGUASVIVAS and
negotiated the purchase of ten grams of fentanyl inside Target Location 2.***

40.    On the following dates, using the same procedures outlined above, confidential sources purchased cut from AGUASVIVAS inside Target Locations 2 and 3: May 20, 2022, June 8, 2023, June 22, 2023, July 10, 2023, and August 24, 2023. During some of those transactions, the confidential sources asked AGUASVIVAS for controlled substances, such as fentanyl, and AGUASVIVAS provided contact information for people who could supply it.

41.    On November 20, 2024, investigators met with a confidential source ("CS-4")[6] to plan for a controlled purchase of cut which CS-4 would purport to need for CS-4's cocaine and fentanyl. Investigators instructed CS-4 to travel to Target Location 2 to buy cut material for cocaine and fentanyl and to lay the groundwork to introduce an undercover agent or another confidential source to AGUASVIVAS.

42.    Through my training and experience, I understand the importance of cutting agents also referred to as bulking agents in drug trafficking. A cutting agent is a specifically formulated, powdered chemical used to dilute and bulk the primary drug, such as cocaine or fentanyl, before it is sold on the street. Additionally, the quality of the cut is important. The cut needs to increase the profit of the primary drug without diminishing the quality of product on the street.

43.    Investigators searched CS-4 and his/her vehicle for contraband and currency with

---

[6] CS-4 began cooperating with investigators after being arrested for controlled substances offenses. The charges were eventually adjudicated with time served and probation based on the CS-3's cooperation. CS-4 is receiving compensation for his/her assistance. CS-4 has a criminal history that includes arrests and/or convictions for assault and battery, domestic violence, and breaking and entering. Information provided by the CS-4 has been corroborated to the extent possible and is believed to be reliable. CS-4 is willing to testify.

negative results. Investigators equipped CS-4 with an audio/video transmitting and recording device and provided him/her with $500 in official funds to purchase the cut.

44.    Investigators followed CS-4 to the area of the Haverhill Street Building. Investigators observed CS-4 exit his/her vehicle and enter Target Location 2.

45.    Once inside Target Location 2, CS-4 met with AGUASVIVAS and negotiated the purchase of narcotic cut material. The meeting was recorded and conducted in Spanish. The recording is preserved, and a Spanish-speaking investigator has reviewed the recording.

46.    CS-4 asked AGUASVIVAS for $250 worth of cocaine cut and $250 worth of fentanyl cut. AGUASVIVAS asked CS-4 what type of cut s/he wanted for fentanyl, and CS-4 told AGUASVIVAS that s/he wanted cut that was not going to kill people. AGUASVIVAS acknowledged CS-4's concern and explained the quality of the different cuts she supplied.  CS-4 and AGUASVIVAS came to an agreement, and AGUASVIVAS provided the cut.

 

[AGUASVIVAS in Target Location 2 on November 20, 2024]

47.    CS-4 then asked AGUASVIVAS for ten grams of good quality fentanyl. AGUASVIVAS said she herself did not have it but that she would check with the boys and that she would call her daughter's husband, "Moreno."

16

48.    AGUASVIVAS then made a phone call. On the phone AGUASVIVAS referred to Moreno as Elvin, which investigators knew, from recordings and from sources of information, is a nickname for RUIZ. While on the phone, AGUASVIVAS asked the person, who investigators believe was RUIZ, if he had any fentanyl that was pure and not mixed with anything. The call ended. The person called AGUASVIVAS back, and AGUASVIVAS told CS-4 that he was waiting for it, meaning the fentanyl CS-4 had requested. CS-4 and AGUASVIVAS agreed that CS-4 would come back another day. AGUASVIVAS provided the fentanyl cut material in exchange for $500 in official funds.

49.    Investigators observed CS-4 exit Target Location 2 and depart the area in his/her vehicle. Investigators followed CS-4 to a predetermined meet location, where other investigators searched CS-4 and his/her vehicle with negative results. Investigators collected a black plastic bag that contained a plastic bag that contained a white powder for cocaine and a plastic container that contained a brown powder for fentanyl.  Based on experience and training, these colored powders were consistent in color and appearance with cut used to dilute narcotics as described above.

***November 22, 2024: RUIZ sold approximately 100 grams of fentanyl in Target Location 2 after entering and exiting the door to 82 Haverhill Street, where Target Location 1 is located.***

50.    On November 22, 2024, investigators met with CS-4 and another confidential source (CS-5")[7] at a predetermined location. Investigators searched CS-4, CS-5, and their vehicles for contraband and currency with negative results. Investigators equipped the CS-4 and CS-5 with

---

[7] CS-5 originally began cooperating with investigators after being arrested for controlled substances offenses in the hopes of receiving leniency. The charges are still pending. CS-5's criminal history includes arrests and convictions for the trafficking narcotics, operating after suspension, and possession of firearm and ammunition. Information provided by the CS-5 has been corroborated to the extent possible and is believed to be reliable. CS-5 is willing to testify.

audio/video recording and transmitting devices and provided them $3000 in official funds to purchase fentanyl from the Target Subjects.

51.    Investigators followed CS-4 and CS-5 to the Haverhill Street Building and observed them exit their vehicles and approach the rear side door of Target Location 2.

52.    CS-4 and CS-5 knocked on the door to Target Location 2, which was opened. An unknown person inside Target Location 2 told them to come in, and they did. CS-4 and CS-5's interactions with the people in Target Location 2 on November 22, 2024, were recorded. The recordings have been preserved and reviewed by Spanish speaking investigators. The recordings captured the faces and voices of RUIZ and AGUASVIVAS.

53.    When they entered Target Location 2, CS-4 and CS-5 encountered two females ("F1" and "F2") and two males ("M1" and "M2").[8] F1 and M2 asked CS-4 and CS-5 why they were there. CS-4 had a conversation with M2 about AGUASVIVAS. M-2 made a phone call and told CS-4, in Spanish, "she isn't answering."  F1 then called someone and told the person who answered, in Spanish, "tell [AGUASVIVAS] to come up, because [CS-4] is here for the merchandise." M1 left, and CS-4 explained to the group that s/he was there for fentanyl, not cut.

54.    Shortly after this phone call, investigators observed RUIZ exit the outer door to 82 Haverhill Street, the address in which Target Location 1 is located, and enter Target Location 2, where CS-4 and CS-5 were waiting. CS-4 and CS-5 spoke to RUIZ about the quality of the fentanyl, and RUIZ made a phone call. RUIZ described the quality and



---

[8] I know the identities of three of the four people described in this paragraph but am not including them because they are not relevant to the determination of probable cause.

provided a price of $30 per gram. CS-4 ordered 100 grams of fentanyl from RUIZ.

55.    Investigators then observed RUIZ leave Target Location 2 and enter the outer door to 82 Haverhill Street, the address in which Target Location 1 is located. Shortly thereafter, an unidentified male ("M3") arrived in a Honda CRV that is registered to RUIZ. Investigators observed that someone tossed M3 a set of keys from above and that M3 used those keys to enter the outer door to 82 Haverhill Street, the address in which Target Location 1 is located.

56.    While CS-4 and CS-5 were waiting for the fentanyl, both  AGUASVIVAS and ARIAS-AGUASVIVAS entered Target Location 2. When AGUASVIVAS walked in, she asked whether RUIZ had been there. AGUASVIVAS commented that the basement was very noisy because she had too many blenders going on, which indicated to CS-4 and CS-5 that AGUASVIVAS had been making cut. Based on experience and training, investigators' knowledge of the Haverhill Street Building, and AGUASVIVAS's reference to blenders in the basement, investigators believe AGUASVIVAS was mixing cut in Target Location 3.

57.    Investigators saw RUIZ exit from the outer door to 82 Haverhill Street, the address in which Target Location 1 is located, and return to Target Location 2. While in Target Location 2, RUIZ handed a black plastic bag that contained a white compressed powder wrapped in clear plastic believed to be fentanyl to CS-5. CS-4 then handed $3,000 in official funds to RUIZ. CS-4 counted the money in front of RUIZ, who did the same. CS-5 then left Target Location 2, while CS-4 stayed behind. Investigators observed CS-5 exit Target Location 2, enter his/her vehicle, and depart the area. Investigators followed CS-5 to the predetermined meet location.

58.    Meanwhile, CS-4, who remained in Target Location 2 and asked RUIZ if he had

cocaine. RUIZ gave CS-4 a price of $20 per gram. RUIZ and CS-4 then walked out of Target Location 2 together, and RUIZ gave CS-4 his phone number.

59.    Investigators observed CS-4 exit Target Location 2, enter his/her vehicle, and depart the area. Investigators followed CS-4 to the predetermined meet location.

60.    Upon their arrivals at the predetermined meet location, investigators searched CS-4, CS-5, and their vehicles, with negative results. Investigators then collected the substance from CS-5, field tested it, and sent it to a DEA laboratory for testing. The laboratory confirmed that the substance weighed 99.940 grams and contained fentanyl.



61.    Based on experience and training, and the facts described above, investigators believe that RUIZ brought the fentanyl from his residence, Target Location 1, where he had been storing the drugs, and carried the drugs to Target Location 2, where he provided them to CS-5.

***February 5, 2025: RUIZ sold approximately 155 grams of suspected fentanyl to CS-4 and CS-5 inside Target Location 2 after making quick trips in and out of the outer door to 82 Haverhill Street, the address in which Target Location 1 is located, and Target Location 3.***

62.    On February 5, 2025, at investigators' direction, CS-4 and CS-5 traveled to Target Location 2 to purchase $4,500 worth of fentanyl.

63.    On that day, investigators met with CS-4 and CS-5 at a predetermined location and searched them and their vehicle for contraband and currency, with negative results. Investigators, CS-4, and CS-5 planned that CS-4 and CS-5 would go to Target Location 2 and see if they could buy fentanyl. Investigators equipped CS-5 with an audio/video recording and transmitting device and provided him/her with $4,500 of official funds to purchase the fentanyl.

64.    Investigators surveilled CS-4 and CS-5 as they drove to Target Location 2.  At

approximately 1:57 p.m., CS-4 and CS-5 arrived in the vicinity of Target Location 2.

65.    CS-5 knocked on the door to Target Location 2 and was greeted by a female ("F3")[9]. The entire transaction inside Target Location 2 was recorded and conducted in Spanish. The recording is preserved and has been reviewed by a Spanish-speaking investigator. AGUASVIVAS's and RUIZ's voices and faces are captured on the recordings.

66.    F3 asked CS-4 and CS-5 what they wanted and pointed to RUIZ, who was in the room. In lightly coded language, CS-4 asked RUIZ for "the thing," referring to fentanyl.  CS-4 stated that it had to be better quality than the last "thing," referring to the prior fentanyl purchase described above. RUIZ acknowledged that the drugs from the previous purchase were not good quality and that he had no way to get in touch with CS-4 and CS-5. RUIZ stated he had something better this time, but it would be more expensive. CS-4 then asked if they could have the same price as before ($30 per gram). CS-4 asked RUIZ for 150 grams for $4500, and RUIZ said he could do that and could go get it. RUIZ then left Target Location 2.

67.    After RUIZ left Target Location 2, but before he returned, AGUASVIVAS, who was in a different room in Target Location 2, entered the room in Target Location 2 in which CS-4 and CS-5 were. AGUASVIVAS started speaking with CS-4. Among other things, AGUASVIVAS told CS-4 that when a person comes to the United States with the mentality of selling drugs, it does not matter because the person will retire with money.

68.    Meanwhile, investigators observed RUIZ walk to Target Location 3 and knock on the basement door while using a cell phone. Investigators saw RUIZ enter Target Location 3 briefly

---

[9] Investigators know the identity of F3, but her identity is not relevant to the determination of probable cause.

before exiting. When RUIZ exited Target Location 3, investigators observed that RUIZ was carrying an aluminum bowl with some items in it.

69.    Investigators then watched RUIZ walk to the front of Target Location 2 while using his cell phone. Investigators then saw RUIZ meet with an unidentified male ("M4"), who had just arrived on foot in the driveway of the Haverhill Street Building.

70.    Investigators observed RUIZ and M4 enter the outer door to 82 Haverhill Street, the address in which Target Location 1 is located. Approximately five minutes later, investigators saw RUIZ exit from the outer door to 82 Haverhill Street, the address in which Target Location 1 is located, and walk to Target Location 2. When RUIZ exited from the outer door to 82 Haverhill Street, where Target Location 1 is located, he was carrying the same aluminum bowl that he had in his hands when he exited Target Location 3. Based on their training and experience, and the fact that RUIZ shortly thereafter provided suspected fentanyl and cut to CS-4 and CS-5, as described below, investigators believe that RUIZ was carrying cut, drugs, or packaging when exiting Target Location 3 and the outer door of 82 Haverhill Street, in which Target Location 1 is located.

71.    RUIZ then returned to Target Location 2 and handed CS-5 two bags, stating that one contained 100 grams and the other contained 50 grams. CS-5 then gave RUIZ $4500 in official funds. While RUIZ was counting the money, AGUASVIVAS asked CS-5 what type of cut they used make their product. AGUASVIVAS told CS-5 that her cut was high quality and invited CS-4 to watch her make the cut. CS-5 noticed that AGUASVIVAS had liquid boiling on the stove and about 30 bottles of lactose next to it. Based on their training and  experience, investigators believe that AGUASVIVAS was in the process of cooking or processing cut material. AGUASVIVAS then gave CS-5 a bag of cut as a sample.

72.    A short time later, investigators observed CS-4 and



CS-5 exit Target Location 2. Investigators then surveilled CS-4 and
CS-5 as they drove back to a predetermined location, where CS-5
provided the suspected fentanyl in the plastic bag to investigators.
A field test was positive for fentanyl. Investigators searched CS-4's
person, CS-5's person, and their vehicle for contraband and currency, with negative results.

73.    Investigators sent the suspected fentanyl (155.2 grams gross weight) to a DEA
laboratory, and results are pending. Based on their training and experience, the physical
appearance of the substance, the other substances seized during this investigation, and the positive
field test, investigators believe the substance contains fentanyl.

74.    Based on experience and training, and the facts described above, investigators
believe that after RUIZ received the fentanyl order from CS-4, RUIZ exited Target Location 2 and
entered Target Location 3 for the purpose of picking up fentanyl or cut. RUIZ then exited Target
Location 3 and entered the outer door 82 Haverhill Street, the address in which Target Location 1
is located. Investigators believe that RUIZ then entered his residence, Target Location 1, to pick
up or package the fentanyl for CS-4. RUIZ then brought the complete order (150 grams) to CS-4
in Target Location 2. Based on these observations, investigators believe that RUIZ and other
Target Subjects store drugs and cut in Target Locations 1, 2, and 3, and conduct their drug business
primarily from Target Location 2.

75.    Based on the extended duration of the Target Subjects' drug-trafficking activity,
spanning from 2021 to the present, the fact that customers, like the confidential sources, can simply
knock on the door to Target Location 2 and request drugs at any time without prior arrangement,
the Target Subjects' continued use of Target Locations 1, 2, and 3 to store narcotics, sell narcotics,

mix and package cut material for use with narcotics, and to conduct negotiations regarding the sale of narcotics, investigators believe that AGUASVIVAS, ARIAS-AGUASVIVAS, and RUIZ have committed the Charged Offense, continue to commit violations of the Target Offenses, and continue to use Target Locations 1, 2, and 3 for the commission of the Target Offenses.

### *Drug Traffickers' Use of Residences and Cell Phones Generally*

76.    Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of the traffickers' residences.  I am also aware that such individuals keep records of their drug dealing, such as contact information of sources/suppliers and customers in their residence.

a.    Controlled substances and materials used to "cut" or dilute those substances;

b.    Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics;

c.    Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, prescriptions, ledgers, text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds, bank records, money orders, wire transfers, cashier's checks, checkbooks, passbooks, certificates of deposit, vehicle rental receipts, credit card receipts, and receipts reflecting rental properties and/or storage units;

d.    Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, telephone address books, planners, notes, ledgers, and telephone bills;

e.    Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking

in controlled substances. Such items include, but are not limited to, jewelry, precious metals such as gold and silver, precious gems such as diamonds, titles, deeds, monetary notes, registrations, purchase or sales invoices, and bank records;

f.      Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities;

g.      Labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments;

h.      Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys;

i.      Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators;

j.      Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, saved usernames and passwords and documents;
k.      Safes or other locked containers and their contents to be searched for the listed items.

77.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, as AGUASVIVAS did on April 21, 2021, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe")

as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

78.    Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds. Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals. In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

79.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes, hidden compartments, or other containers so that other individuals who enter their residence do not discover these materials.

80.    Many drug dealers receive their drugs through overnight parcels and keep mailing labels both used and unused in their residence for future use. Additionally, such drug traffickers often send the proceeds of their drug sales via overnight delivery, Western Union, and/or wire to

their suppliers in order to pay for a continuing supply of drugs.  Such individuals will often maintain records of these transactions for a period of time in case there is a later dispute concerning what funds were transmitted and when.

81.    Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators.  As described above, AGUASVIVAS, ARIAS-AGUASVIVAS, and RUIZ used cellular telephones to communicate with people to arrange drug and drug purchases and money payments.  In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance.  Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residences.  Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences.  As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug dealers' residences.

82.    Seizure of devices containing this information will provide information relating to coconspirators and accomplices.  I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators,

and that they communicate both via both voice calls and via email and/or text messaging.  I also know that persons who sell illegal drugs regularly keep records of their illegal activities.  These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers.  Individuals engaged in drug trafficking activities often take photographs of their closest confederates.  Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone.  From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

83.    Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via the internet.  I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online.  Additionally, many cellular phones today have a GPS navigation device on the phone.  Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals.  Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

84.     Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards.  I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet.  This is true because:

a.     Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b.     Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.     Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

## Conclusion

85.     WHEREFORE, I submit that there is probable cause to believe that AGUASVIVAS, ARIAS-AGUASVIVAS, and RUIZ, have conspired with each other, and others, to distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846, and that evidence of the Target Offenses, described more fully in Attachment B, will be found in Target Locations 1, 2, and 3, which are described more fully in Attachments A-1, A-2, and A-3.

Respectfully submitted,

*Daniel G Cronin*

Daniel Cronin, Task Force Officer
Federal Bureau of Investigation

Sworn via telephone in accordance with Fed R. Crim. P. 4.1 on March 7, 2025

Honorable Jennifer C. Boal
United States Magistrate Judge

30